IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

*Alexandria Division*

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>DAN BENEDICT GALVEZ,<br>a/k/a, "Flip,"<br><br>*Defendants.* | Case No. 1:25-mj-421<br><br>**UNDER SEAL** |

**AFFIDAVIT IN SUPPORT OF A
CRIMINAL COMPLAINT AND ARREST WARRANTS**

I, Matthew Lanman, being duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1. This Affidavit is submitted in support of a criminal complaint and related arrest warrant charging that, from at least in or around January 2023 and continuing through November 22, 2024, within the Eastern District of Virginia and elsewhere, the defendant, DAN BENEDICT GALVEZ ("**GALVEZ**") did knowingly and intentionally combine, conspire, confederate, and agree with others, known and unknown, to distribute 500 grams or more of a mixture and substances containing a detectable amount of cocaine, a Schedule II controlled substance, in violation of 21 U.S.C. §§ 841(a)(1) and 846.

2. I further submit there is probable cause to believe that on or about November 22, 2024, in the Eastern District of Virginia, **GALVEZ** knowingly possessed a firearm, namely a Glock 48 pistol, serial number BLFH533, in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A).

3. I am a Task Force Officer assigned to the Federal Bureau of Investigation ("FBI") and am duly employed by Prince William County Police Department as a Detective of the Special Investigation Bureau, Narcotics Unit. I have been so employed since January 2017 and qualify as an "investigative or law enforcement officer of the United States" within the meaning of 18 U.S.C. § 2510(7) empowered by law to conduct investigations of and to make arrests for offenses enumerated in Titles 18 and 21 of the United States Code. I am currently assigned to a squad operating out of the FBI's Washington Field Office that investigates gang-related, drug-related, and violent crimes. I have personally participated in investigations of gangs and drug-related crimes operating in Virginia, Maryland, and Washington, D.C. I have also participated in investigations involving unlawful narcotics distribution. As part of these investigations, I have been involved in the application for and execution of arrest and search warrants for narcotics-related offenses resulting in the prosecution and conviction of individuals and the seizure of illegal drugs, weapons, illegal drug proceeds, and other evidence of criminal activity.

4. Based on my training and experience, I am familiar with the methods used by individuals involved in the distribution of narcotics and drug trafficking. For example, drug traffickers are often in possession of large amounts of narcotics and/or cash. Because of the illicit nature of narcotics trafficking, those engaged in the sale of narcotics have no legal recourse should they be robbed, so they carry firearms to protect themselves, their drugs, and their cash. I have also learned that individuals involved in drug trafficking rarely refer to narcotics by their true name. Instead, to conceal the nature of their illegal activities and to prevent detection by law enforcement, they refer to narcotics by using seemingly innocent terms or coded language.

5. The facts in this Affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses, including review of reports

and other documentation related to this investigation. This Affidavit does not contain every fact known to law enforcement regarding this investigation, but rather contains only information necessary to demonstrate probable cause in support of a criminal complaint and arrest warrant.

## PROBABLE CAUSE

6. The conduct underlying this Affidavit was discovered as part of a federal investigation into the conduct of a street gang known as "X3M." The investigation has been ongoing since in or around June 2024 and was started through information gathered from two sources: a confidential human source ("CHS1")[1] and a co-conspirator to **GALVEZ** ("CC-1").[2] The investigation has revealed that members of X3M engage in a multitude of illegal behavior to make money. The primary method of making money for X3M is the distribution of narcotics, for the purposes of this Affidavit, cocaine. However, in furtherance of the members' narcotics distribution, members of X3M commit other crimes, including, as relevant here, the illegal possession of firearms. Information from the investigation has shown that **GALVEZ** is affiliated with X3M and primarily worked with X3M's leader, Jorge Ariel Pereira ("PEREIRA"), to consistently distribute controlled substances, including cocaine, since at least January 2023.

---

[1] CHS1 is a paid source who has criminal convictions related to domestic violence, possession of a stolen vehicle, and possession of narcotics. The information CHS1 provided has been corroborated through independent means, including consensually recorded messages. CHS1's information has never been found to be false or misleading. For these reasons, investigators consider CHS1 to be credible and reliable.

[2] CC-1 was convicted in federal court of narcotics and firearm offenses. CC-1 has provided information in hopes of a sentencing reduction. CC-1 has other convictions related to the possession/distribution of narcotics. The information provided by CC-1 has been corroborated through multiple means, including search warrant returns for social media accounts and cell phones. For these reasons, investigators consider CC-1 to be credible and reliable.

3

A. **Existence of X3M**

7. Law enforcement's first step in the investigation was to confirm that X3M did exist and was tied to PEREIRA and **GALVEZ**. As part of a separate investigation, law enforcement secured a search warrant for an individual's Instagram account who turned out to be a co-conspirator of PEREIRA ("CC-2"). In CC-2's Instagram account, law enforcement found a publicly posted photo showing two necklaces: one reading "X3M" and one reading "LUCA." The Instagram handle "jaelucax3m" was tagged in the post. Law enforcement learned from CC-1 and other sources that "Jae Luca" is a known alias for PEREIRA. The photo can be seen below:



8. Additionally, as part of CC-1's arrest, law enforcement searched CC-1's cell phone. In the cell phone, law enforcement found a photo of jewelry sent by XXX-XXX-8010, a number

4

law enforcement has attributed to PEREIRA.³  The photo depicts, among other items, a necklace reading "X3M," one reading "LUCA" where the "L" is in the shape of a pistol with an extended magazine, and one reading "FLIP."  "Flip" is a known alias for **GALVEZ**.  The photo can be seen below:



---

³ The contact for -8010 in CC-1's phone is saved under the contact name "Lucka."  Law enforcement has seen the -8010 number saved in other phones reviewed as part of this investigation.  The -8010 number has been saved in these phone in variations of "Luca" which, as mentioned in paragraph 8, is a known alias for PEREIRA.  The -8010 number also returns to a CashApp account under the name "Kevin Aguirre."  "Kevin Aguirre" is a known fictitious identity for PEREIRA.  In the Instagram exchange with CC-2 mentioned in paragraph 8, the "jaelucax3m" account sent CC-2 a photo of a Texas identification card in the name "Kevin Aguirre" with a photo of PEREIRA.

5

B. **Social Media Accounts and Cell Phone Analysis Show Depths of Cocaine Conspiracy**

9. The confirmation of the existence of X3M led law enforcement to further investigate PEREIRA and **GALVEZ**'s narcotics dealings. The investigation revealed that CC-1, PEREIRA, and **GALVEZ** were working together to acquire and distribute various narcotics since at least January 2023, including cocaine. CC-1 stated that CC-1 and **GALVEZ** would often buy distribution level narcotics from PEREIRA dating back to at least the beginning of 2023. The volume of the purchases increased over time. For instance, in summer 2023, PEREIRA would "front" CC-1 approximately half a kilogram (approximately 500 grams) of cocaine on a weekly basis. In my training and experience, distributors "front" narcotics by supplying a buyer and collecting payment for the narcotics at a later date, usually once the narcotics were sold. **GALVEZ** would also purchase approximately half a kilogram of cocaine from PEREIRA at various times in 2023.

10. Based on this information, law enforcement secured several search warrants for various social media accounts and cell phones tied to **GALVEZ**, PEREIRA, and other co-conspirators during the investigation. The returns from these warrants corroborate CC-1's information that PEREIRA was a cocaine source of supply generally for customers in the Northern Virginia region and that PEREIRA, CC-1, and **GALVEZ** consistently worked together to distribute cocaine and other controlled substances from at least January 2023 until CC-1 and **GALVEZ**'s respective arrests.[4]

---

[4] As discussed further below, **GALVEZ** was arrested by Prince William County law enforcement on November 22, 2024. He has been in state custody since this date.

6

11. For instance, law enforcement was able to attribute the "jaelucax3m" Instagram account to PEREIRA and secure a search warrant for it. In the returns, law enforcement found many examples of PEREIRA attempting to distribute cocaine to others from at least February 2023 onward. In February 2023, for example, PEREIRA sent an Instagram message to a contact of his, with PEREIRA stating, "Yo I got some [fire emoji] [snowflake emoji] if you know [sic]." In my training and experience, I know that narcotics dealers use an emoji of a snowflake to describe cocaine, as "snow" is a common street term for cocaine. I further believe, based on my training and experience, that the fire emoji indicated that PEREIRA believed that the cocaine was of high quality.

12. During a review of CC-1's cell phone, law enforcement found consistent communications between PEREIRA and CC-1 discussing narcotics transactions. For example, in or about May 2023, CC-1 asked if PEREIRA had some "girl." Based on my training and experience and knowledge of this investigation, "girl" is a street term used by PEREIRA and his co-conspirators to discuss cocaine. PEREIRA acknowledged he had cocaine and PEREIRA agreed to sell CC-1 two "zips." In my training and experience, a "zip" is a street term for an ounce of a controlled substance. One ounce translates to approximately 28 grams.

13. In August 2023, CC-1 again told PEREIRA he would meet PEREIRA to pick up more "girl." Shortly after the exchange, CC-1 told PEREIRA that "[t]his one right." PEREIRA responded that he "honestly just broke the brick bro I got more like that . . ." Based on my training and experience and the context of the conversation, I believe PEREIRA's mention of a "brick" was referring to a kilogram of cocaine. A kilogram of cocaine is often packaged in a pressed, "brick" like form. PEREIRA's reference to having "more like that" was likely a reference to having more kilogram cocaine bricks like the one he used to supply CC-1 with "girl." This

7

exchange was during the same general time period that CC-1 stated he was being fronted half a kilogram of cocaine weekly from PEREIRA.

14. Messages from other search warrant returns confirmed PEREIRA and **GALVEZ** worked together to distribute cocaine and other controlled substances into and through 2024. For instance, **GALVEZ** was arrested on state charges in May 2024 and a cell phone on his person was searched for evidence of narcotics pursuant to a search warrant. Law enforcement discovered messages between **GALVEZ** and PEREIRA discussing drug transactions. These messages range from August 2023 through the defendant's May 2024 arrest and consistently show **GALVEZ** purchasing "girl" from PEREIRA throughout that time frame.

15. For example, on or about May 8, 2024, PEREIRA asked **GALVEZ** if **GALVEZ** was "clearing out girl." **GALVEZ** acknowledged he was "clearing the girl." On or about May 10, 2024, **GALVEZ** stated he had some "money for the girl." On or about May 16, 2024, PEREIRA told **GALVEZ** to "clear the . . . girl tab so I can load you up." PEREIRA emphasized that "we gotta start getting in order bro so we can keep a consistent flow and move up." Based on my training and experience and knowledge of this investigation, PEREIRA's statement about what to "load [**GALVEZ**] up" on was a reference to resupplying **GALVEZ** with cocaine for redistribution. Clearing the "girl tab" was a reference for **GALVEZ** to pay PEREIRA for the cocaine PEREIRA was fronting **GALVEZ**. PEREIRA expressing a desire to "move up" was to increase PEREIRA's & **GALVEZ**'s cocaine distributions.

16. Law enforcement also found additional evidence that **GALVEZ** was possessing and/or distributing significant amounts of cocaine during this time period. For example, law enforcement found a video on **GALVEZ**'s phone dated November 29, 2023 of **GALVEZ** holding up a compressed, white substance suspected to be cocaine. The video later depicts what appears

to be a separate compressed, white substance sitting on a digital scale. Based on my training and experience and the size of the substance shown, the video shows **GALVEZ** possessing a conservative estimate of 100 grams of suspected cocaine, as well as an additional 150 grams on the digital scale. Screenshots of **GALVEZ** holding the suspected cocaine and the digital scale are below.

 

17. Additionally, law enforcement found a video dated January 26, 2024 on **GALVEZ**'s cell phone. The video depicts a chuck of a white substance suspected to be cocaine. The white substance is compressed into a brick-like form consistent with how cocaine is compressed. Based on my training and experience and the size of the substance shown, the video shows a conservative estimate of 125 to 150 grams of suspected cocaine. A screenshot of the

9

substance depicted in the video is shown below.  **GALVEZ**'s phone contains numerous videos/photos like the ones depicted here in paragraphs 17–18.



**C.      Cocaine-Related Arrests of GALVEZ; Possession of Firearms**

18.     In addition to CC-1's information and the corroboration found in the various social media accounts and cell phones searched during the investigation, **GALVEZ** was arrested twice in 2024 on state charges related to his cocaine distribution during the investigation.

19.     On or about May 20, 2024, law enforcement responded to an area in Woodbridge, Virginia in reference to a suspicious person who appeared to be breaking into a vehicle.  Several subjects fled upon law enforcement approaching the area and were then provided commands to

10

stop. One of the fleeing subjects was **GALVEZ**, who was detained a short time later. Upon returning to the vehicle that officers suspected **GALVEZ** of tampered with, officers observed another vehicle running close by. Another individual was observed in the rear of the nearby running vehicle. Law enforcement checked the registration of the vehicle by running the tag number through Virginia databases and discovered the vehicle was registered to **GALVEZ**, who was already detained. Based on the circumstances, law enforcement ordered the individual out of the vehicle. The individual had a firearm concealed on his person without a permit and claimed the firearm was already in the car when he entered it. An ammunition magazine was seen in the back seat of the vehicle where the individual exited the vehicle from. Law enforcement then performed a full search of the vehicle. During the search, law enforcement found approximately 55.98 grams of cocaine as well as other narcotics in the vehicle.

20. **GALVEZ** was charged related to the incident but was released on bond that same day. Within approximately 24 hours of his arrest, **GALVEZ** was arrested again, this time for a DUI charge. Law enforcement seized the phone on **GALVEZ**'s person during the DUI arrest and that phone was searched for evidence of narcotics pursuant to a search warrant. Law enforcement found messages in the phone between **GALVEZ** and PEREIRA confirming **GALVEZ** was involved with and aware of the narcotics found in the vehicle the night prior on or about May 20, 2024. **GALVEZ** messaged PEREIRA shortly after **GALVEZ**'s release on bond on or about May 20, 2024, stating the police "took my dawgs my work my money." In my training and experience, the term "dawg" is a street term for a firearm. Approximately $1,791 was recovered from the car. Additionally, the term "work" is generally a reference to narcotics an individual has for sale. **GALVEZ** later explained to PEREIRA that **GALVEZ** "ran [and] I got caught w nothing on me but my phone, s*** was in car."

21. In November 2024, **GALVEZ** was wanted again on various state warrants, including several failures to appear related to his May 2024 charges. Law enforcement received information that **GALVEZ** was in a particular area in Prince William County, Virginia and surveilled vehicles in the area to try and identify **GALVEZ**. On or about November 22, 2024, law enforcement observed **GALVEZ** exiting a truck in a shopping center parking lot in the surveillance area. Law enforcement then observed **GALVEZ** entering and exiting various vehicles, which is consistent with short-term narcotics distribution. While **GALVEZ** was in the back right passenger seat of one vehicle, law enforcement approached the vehicle to arrest **GALVEZ**, announcing their presence as they approached. While law enforcement was approaching the vehicle, **GALVEZ** made certain movements towards the floor of the vehicle and then opened the left side passenger door and attempted to flee. **GALVEZ** was restrained and subsequently arrested on the outstanding warrants.

22. Law enforcement searched the vehicle. In the floorboard of the vehicle **GALVEZ** attempted to flee from, law enforcement observed and recovered approximately 25.38 net grams of cocaine behind the driver seat and a Glock 48 pistol, serial number BLFH533, located in the rear passenger floorboard where **GALVEZ** was originally seated. Law enforcement also recovered a scale and cell phone from **GALVEZ**'s person and searched the cell phone pursuant to a search warrant. In the cell phone, law enforcement found messages confirming that **GALVEZ** was committing narcotics transactions in the vehicles law enforcement observed him entering and exiting. Around the time **GALVEZ** was arrested, he texted a contact of his saying he was "making 2 sales on this side then comin[g]" to meet the contact. Additionally, law enforcement found a photo of **GALVEZ** with a pistol that is visibly identical to the Glock 48 recovered in the right rear

floorboard where **GALVEZ** was originally seated. Photos of **GALVEZ** in possession of the visibly identical gun are below, alongside a photo of the Glock 48 after it was seized.






23. Based on the above information, I believe **GALVEZ** was distributing cocaine to customers while law enforcement was surveilling him and was possessing the Glock 48 during the distributions. In my training and experience, narcotics dealers often arm themselves with pistols and handguns to protect their narcotics, proceeds, and person while distributing narcotics. The movements towards the floorboard shortly before **GALVEZ**'s arrest were likely to discard the cocaine and Glock 48 from his person before law enforcement could reach the vehicle.

## CONCLUSION

24. As summarized in this Affidavit, law enforcement has received credible information from sources, including CC-1, that **GALVEZ** had consistently conspired with others to distribute controlled substances including cocaine from January 2023 through his arrest and detention in November 2024. In my training and experience, narcotics distribution is a continuous enterprise and participants rarely quit absent intervention by law enforcement. Based on the information provided from CC-1, the evidence of significant cocaine possession by **GALVEZ** during the relevant time period, the consistent discussion of cocaine distribution between PEREIRA and **GALVEZ** found in the social media accounts and cell phones, and the cocaine seized during **GALVEZ**'s arrest, the evidence shows PEREIRA and **GALVEZ** have conspired to distribute well over 500 grams or more of cocaine since at least January 2023.

25. Therefore, based on the facts in this Affidavit, I respectfully submit there is probable cause to believe that, from at least in or around January 2023 and continuing through November 22, 2024, within the Eastern District of Virginia and elsewhere, the defendant, **GALVEZ**, did knowingly and intentionally combine, conspire, confederate, and agree with others, known and unknown, to distribute 500 grams or more of a mixture and substances containing a

detectable amount of cocaine, a Schedule II controlled substance, in violation of 21 U.S.C. §§ 841(a)(1) and 846.

26. Additionally, I further submit there is probable cause to believe that on or about November 22, 2024, in the Eastern District of Virginia, **GALVEZ** knowingly possessed a firearm, namely a Glock 48 pistol, serial number BLFH533, in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A).

Respectfully submitted,

*Matthew Lanman*
Matthew Lanman
Task Force Officer
Federal Bureau of Investigation

Attested to in accordance with the requirements of
Fed. R. Crim. P. 4.1 via telephone on July 17, 2025:

Digitally signed by Ivan Davis
Date: 2025.07.17 16:04:57 -04'00'

Hon. Ivan D. Davis
United States Magistrate Judge
Eastern District of Virginia

15